CASE 85.—ACTION BY ARRENA CRUTCHER AGAINST THE
　　　SOUTH COVINGTON & CINCINNATI STREET RAIL-
　　　WAY COMPANY FOR DAMAGES FOR PERSONAL
　　　INJURIES.—December 9, 1909.

# South Covington & Cincinnati Street Ry. Co. v. Crutcher

Appeal from Campbell Circuit Court.

J. W. Yungblut, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1.　Carriers—Injuries to Passengers—Contributory Negligence—
　　Action—Emergency.—Plaintiff, a woman 69 years of age, was
　　injured while riding on defendant's street car by a collision
　　between the car and an ice wagon approaching each other
　　at right angles at a crossing.　Plaintiff saw the wagon and
　　the danger of collision, just before it occurred, when she got
　　up and stepped to the other side of the car as she saw other
　　passengers doing; and, when the collision occurred, she was
　　thrown forward onto the back of a seat, and the tongue of
　　the wagon, entering the car, dragged down over her back
　　and hip.　Held, that plaintiff's act in moving from her posi-
　　tion was done in an emergency not　of her creation, and
　　the fact that she made an unwise choice of means to escape
　　did not constitute contributory negligence.
2.　Street Railroads—Injuries to Passengers.—Street Car Colli-
　　sion—Duty of Motorman.—A street car motorman in ap-
　　proaching a crossing, while bound to keep a lookout for per-
　　sons or vehicles crossing or about to cross the track, is not
　　required to stop and look up and down the street he is
　　crossing; his primary duty being to look ahead and observe
　　persons or vehicles approaching the track within the ordi-
　　nary range of his vision while so looking, being entitled to pre-
　　sume that the driver of a vehicle approaching the track will
　　have his team under control.

3.  Carriers—Injuries to Passengers—Streets—Collision with Ice
    Wagon—Negligence.—Where an ice wagon which collided
    with a street car at a crossing was not within the motor-
    man's ordinary range of vision as he was looking ahead when
    he started to cross the track, but was approaching the
    crossing at a high rate of speed, and when the motorman saw
    that a collision was imminent, and stopped the car in the
    middle of the street, the wagon was only 10 or 12 feet distant,
    and to have kept the car in motion would have increased the
    force of the collision, the motorman was not negligent in
    failing to observe the wagon earlier or in stopping the car.

L. J. CRAWFORD for appellant.

A. M. CALDWELL for appellee.

OPINION OF THE COURT BY WM. ROGERS CLAY, COM-
MISSIONER—Reversing.

Appellee, Arrena Crutcher, instituted this action
against the South Covington & Cincinnati Street
Railway Company to recover damages for personal
injuries. The jury returned a verdict in her favor
for $200. From the judgment based thereon this
appeal is prosecuted.

The accident occurred at the intersection of Pearl
and Pike streets, in Cincinnati, Ohio, on May 20,
1908. Pearl street runs east and west, and Pike
street begins on the north side of Pearl and runs a
short distance up a rather steep hill. As the street
car reached the middle of Pike street, it came in con-
tact with an ice wagon coming down that street. The
tongue of the wagon passed through one of the win-
dows of the car and injured appellee. Her account
of the accident is as follows: "I got on board of
the car there, and went over, and, when we came to
Pearl and Pike, there this accident occurred. An
ice wagon came down the street. They were going,
of course, I suppose at a pretty good rate of speed.

I couldn't exactly state the speed at the time that the car was traveling; but I saw the wagon coming, and I thought in all probability there was danger. So I waited a few minutes. I seen the other passengers get up, step to the opposite side of the car. I thought, well, there will be an accident. I will rise up and step into the aisle. And I was sitting with my right side against the window. When I raised partially up, just as I raised the crash came, and the tongue of the wagon came through the window and caught me, when I was only about halfway raised, over my right shoulder, and, of course, as they fell down, it throwed me forward on to the back of the seat in front of me, and the tongue dragged down over my back and right hip. Of course, it stunned me a little bit. And that was the way that accident occurred." Appellee further testified that she saw the wagon coming as she looked up Pike street, for she could see up that street a short distance before she reached the corner. She also testified as follows: "Well, the reason I thought so (that there would be an accident) was because the ice wagon was very near and coming very rapidly down the street. I didn't see as well as I could understand it how an accident could be avoided. I don't know, I thought that perhaps the car would pass swiftly enough over Pike street to escape a collision. Of course, I didn't have an idea whether it would hit the window or not; but I thought, well, I will get up and step to the other side of the car, as I saw the other passengers going that way over.'

Thomas Lewis, another witness for appellee, testified substantially as follows: "The grade on Pike street is very steep. When the car reached Pike street, the motorman did not do anything, but kept

on coming pretty fast. If he had looked before crossing, there was nothing in the way to prevent him from seeing the wagon. When the wagon was within 10 feet of the car, the motorman rang his bell, and stopped the car. The car was stopped in the middle of the street. When it stopped, the wagon ran into it.'' This witness also made the following statement: ''The reason I am satisfied he stopped it, because, if he hadn't stopped the car, I think there would have been more of an accident than what there was, I am satisfied the motorman stopped the car, but he stopped it with a sudden stop. all at once. If he had kept on, he would have avoided the accident.''

Thomas Donahue, appellant's motorman, gave the following acount of the accident: ''Well, about the time before the accident, going west on Pearl street there was a big express wagon. Whether it came from the depot I don't know, but it was in the front of me, and, of course, he would not get out of the track, and he turned to go up Pike street. Well, of course, I was going slow at the time. I could not go fast because I was following him up. When he turned the corner of Pike street, of course, I gave her about half speed, and I happened to hear something. I could not see anything because this big black covered wagon was in the shade of the ice wagon. When I got just by there, I could see her coming, and, then this ice wagon was tearing down the street, it stunned me for a minute. I did not know which way to go or what to do or anything else because I knew that I would get hit. He would get me anyhow, so I didn't know what to do. So I tried to make for the opposite side of the street, and I says, no, I cannot make it, he will get me anyhow. So I just waited; stood there thinking that he would slow his horses

around, and go the other way; but he did not wheel the wagon because I was a little over halfway of the street, and I just had to stand there and take it. If he had slewed around the other way down Pearl street, he would have just taken the whole end of the car out, because the wagon would be turned around, slewed around, and taken the whole front end of the car off. So I tried to avoid it the best way I could, so I stopped. I think, if I had been going at the time when the accident occurred, it would have took and done more damage that what it did." This witness further testified that the driver of the wagon tried to go east. After the wagon which was in front of the car turned up Pike street, witness saw the ice wagon. He then put on half speed, and started across the street at the rate of five or six miles an hour. Just as he put on half speed the ice wagon was right on top of him. He then had no time to get out of the way. The wagon was coming like the fire department.

John Swis, the conductor, testified that he did not notice the ice wagon until it was within 10 feet of the car. So far as he knew, there was no wagon in front of the car. The ice wagon was coming down the street very rapidly.

Edward Riggs, a passenger on the car, testified as follows: "Well, as we came to the corner there, why, there seemed to be a wagon in front of the car. I remember the motorman ringing his gong. Right after that wagon had turned out, why, an ice wagon came down Pike, and the pole and the horse's head came in the side of the car, broke the side out, and scattered glass. I ducked my head down to get out of the way of the glass. The motorman seemed to be doing the best he could for to stop his car immediately. If he

hadn't, we would all have been caught on that side of the car. The pole would have taken out the whole side of the car there."

Harry Evans, a passenger on the car, testified that when he saw the ice wagon it was 10 or 12 feet from the car; that the wagon was coming very rapidly. The motorman rang the gong several times and stopped the car. The ice wagon was going even faster than the fire department does sometimes.

John Adam Skinner, a passenger on the car, testified that just as they got to Pike street he saw the ice wagon dashing down that street, and before he knew it the tongue had crushed through the car. He thought the driver endeavored to turn his team to the east.

Two grounds are urged for reversal: First, the failure of the court to award appellant a peremptory instruction; second, contributory negligence on the part of appellee. We shall discuss the second contention first.

The evidence shows that appellee was 69 years of age. It is insisted that she was guilty of contributory negligence in getting up and going to the other side of the car. When her whole evidence is read, it is manifest that there was but a short period of time intervening between the time she saw the wagon and the time it came in contact with the car. Thus an emergency was presented. She was not placed in a perilous position by any act of hers. She had a right to make a choice as to the means to be used to avoid the peril. The making of an unwise choice under such circumstances does not constitute contributory negligence. Louisville & Nashville R. R. Co. v. Molloy's Adm'x, 107 S. W. 217, 32 Ky. Law Rep. 745. The only question in the case is whether or not a

peremptory instruction should have gone in favor of the appellant. While one witness expressed the opinion that had the motorman proceeded across the street he would have avoided the accident, this witness does not state facts which tend to support this conclusion. When the car reached the middle of the street, the ice wagon was within 10 or 12 feet of it, and the circumstances all indicate that, had the car gone on, the ice wagon, instead of striking the car about the third window from the front, would have struck it near the center of the car, or towards the rear; and the impact would of necessity have been much greater, because both the wagon and the car would have been in motion. Thus it will be seen that there are no facts tending to show that the act of the motorman in stopping the car constituted negligence. It is mere speculation to say that had he gone on across the street he would have avoided the accident. All the circumstances tend to rebut this presumption. It is manifest that the only negligence on the part of the motorman, if there was any, consisted in his failing to observe the approach of the wagon, or in attempting to cross the street in the face of the danger likely to arise from coming in contact with the ice wagon. As a street car approaches a street crossing, it is the duty of the motorman to keep a lookout for persons or vehicles crossing or about to cross the track. In discharging this duty he is not required to stop and look up and down the street he is crossing. His primary duty is to look ahead, and to observe persons or vehicles approaching the track within the ordinary range of his vision while so looking. He has the right to presume that the driver of a vehicle approaching the track will have his horse or horses under control. Were he required

to look up or down the street to avoid coming in contact with a runaway horse attached to a vehicle, a most uncommon occurrence, he might strike a vehicle or a person crossing the track, a very common occurrence, and thus injure such person or one of his passengers by his failure to keep a proper lookout. There is nothing in the evidence to show that the motorman saw the ice wagon until it was within 10 or 12 feet of the car. Nor is there any evidence tending to show that it was within the ordinary range of his vision as he looked ahead and started across the street. When the car stopped in the middle of the street, the wagon was then 10 or 12 feet distant. It was coming like the fire department; that is, at a very rapid rate. That being the case, the wagon must have been a considerable distance up the street when the motorman started the car across. It was not negligence, therefore, on his part to fail to observe the wagon when he could not see it and at the same time keep a proper lookout ahead.

For the reasons given, we conclude that the trial court erred in refusing to instruct the jury to find for appellant.

Judgment reversed and cause remanded for a new trial consistent with this opinion.